IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JASON WICKLINE, et al.,

        Plaintiffs,

v.                                            CIVIL ACTION NO. 2:23-cv-00799

CPL. T. J. CUMBERLEDGE, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Kanawha County Commission's motion to dismiss. (ECF No. 10.) For the reasons more fully explained below, the motion is **GRANTED**.

## I.    BACKGROUND

This matter arises from a warrantless search of a couple's home. At all times relevant herein, Plaintiffs Jason and Shanna Wickline ("Plaintiffs") were a married couple living in St. Albans, West Virginia. (ECF No. 1 at 2, ¶ 7.)

At 1:30 in the morning on November 7, 2021, someone knocked on Plaintiffs' front door and woke them up. (*Id.* at 2–3, ¶ 8.) They went to the door, opened it, and found multiple police officers standing outside.[1] (*Id.*) The officers immediately asked if a Laurel Wolfe was inside. (*Id.*) Plaintiffs said no. (*Id.*) Plaintiffs also told the officers who they were and that they had lived there for the past two years. (*Id.*) The conversation apparently ended there, and Plaintiffs

---

[1] The complaint does not specify which law enforcement agency these officers belonged to.

returned inside. (*See id.*) However, before leaving, the officers went into Plaintiffs' backyard, shined their flashlights around, and peered into Plaintiffs' windows. (*Id.*)

Several U.S. Marshals stopped by Plaintiffs' house the next day. (*Id.* at 3, ¶ 9.) Plaintiffs weren't home, though, so the Marshals had to settle for talking to a neighbor. (*Id.*) The Marshals asked the neighbor whether a Laurel Wolfe was at Plaintiffs' house. (*Id.*) The neighbor said no and told the Marshals that "Laurel Wolfe hadn't lived there for years." (*Id.*) He then gave the Marshals some contact information for someone in Laurel Wolfe's family, and the Marshals left. (*Id.*)

Later that same evening, two Kanawha County Sheriff's Department ("KCSD") deputies went to Plaintiffs' home. (*Id.* at 3, ¶ 10.) Plaintiffs had returned home by then and were there to talk to the deputies. (*Id.*) However, the deputies asked the same questions as before, and Plaintiffs again said that they had lived there for two years and that they did not know a Laurel Wolfe. (*Id.*) The deputies apologized for the inconvenience and left. (*Id.*)

Five weeks passed and Plaintiffs heard nothing more about Laurel Wolfe. But on December 15, 2021, Plaintiffs came home at the end of the day and found a business card on the table. (*Id.* at 3, ¶ 11.) The card belonged to T.J. Cumberledge, an officer with the KCSD. (*Id.*) Plaintiffs asked their minor son (who lives with them) if the police had been at their home. (*Id.*) The son said that he had found the card jammed in the door when he arrived home from school earlier in the day. (*Id.*) So Jason called Cumberledge and asked about the card. (*Id.* at 3, ¶ 12.) Cumberledge informed Jason that there was a new arrest warrant out for Laurel Wolfe, and that they had been there to execute that warrant. (*Id.*) Jason reiterated—for the third time—that Laurel Wolfe did not live there and that he and his wife did not know her. (*Id.*) Curiously, before

2

hanging up the phone, Cumberledge told Jason "that his door had been unlocked when the[] [officers] had been there." (*Id.*)

So Plaintiffs checked their home surveillance cameras the next day. (*Id.* at 4, ¶ 13.) As it turned out, three KCSD officers, purportedly acting as U.S. Marshals, had barged into Plaintiffs' home while they were away. (*Id.*) The officers entered Plaintiffs' home with their guns drawn and searched Plaintiffs' entire house—all under the auspices of searching for Laurel Wolfe. (*Id.* at 4, ¶¶ 13, 15.) They did so without a search warrant. (*Id.* at 5, ¶ 20.)

Plaintiffs filed suit in this Court on December 15, 2023, invoking the Court's jurisdiction under 28 U.S.C. § 1331. (ECF No. 1.) They sued Cumberledge, John Does 1, 2, and 3, and Defendant Kanawha County Commission ("Defendant").[2] (*Id.*) Their three-count complaint alleges a (1) Fourth Amendment claim for an unreasonable search; (2) a *Monell*[3] claim; and (3) a negligence claim.[4] (*Id.* at 4–8, ¶¶ 17–35.) As for relief, Plaintiffs seek compensatory and punitive damages, attorney's fees, and costs. (*Id.* at 8.)

On April 15, 2024, Defendant moved to dismiss the *Monell* claim.[5] (ECF No. 10.) Plaintiffs filed a response in opposition on April 29, 2024, (ECF No. 13), to which Defendant replied on May 6, 2024, (ECF No. 14). The matter is now ripe for adjudication.

---

[2] Cumberledge and John Does 1, 2, and 3 are being sued in their individual capacities only.
[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).
[4] This Court has jurisdiction over Plaintiffs' state-law negligence claim under 28 U.S.C. § 1367.
[5] The Commission also moved to dismiss the negligence claim. However, in Plaintiffs' response brief, they did not address this part of Defendant's motion. Plaintiffs instead said that the *Monell* claim "is the only count" their complaint brought against Defendant. (ECF No. 13 at 2–3.) Although the complaint clearly levied a negligence claim against Defendant, (*see* ECF No. 1 at 7–8, ¶¶ 32–35), the Court finds that Plaintiffs have abandoned that claim as it relates to Defendant, *Brevard v. Racing Corp. of W. Va.*, No. 2:19-cv-00578, 2020 WL 1860713, at *8 (S.D. W. Va. Apr. 13, 2020) (noting plaintiff abandoned a claim by failing to respond to defendant's argument), and the Court hereby **GRANTS** Defendant's motion to dismiss Count III.

## II.  LEGAL STANDARD

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint. Fed. R. Civ. P. 12(b)(6). A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In applying this standard, a court must utilize a two-pronged approach. First, it must separate the legal conclusions in the complaint from the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.* Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

## III.  DISCUSSION

Defendant offers two reasons for dismissal. First, Defendant says the search did not violate the Fourth Amendment. (ECF No. 11 at 4–7.) Second, and even if it did, Defendant argues that Plaintiffs failed to adequately allege that the search occurred pursuant to an official

4

policy or custom, which is an essential ingredient of their *Monell* claim. (*Id.* at 7–9.) Success on either ground means Defendant's motion must be granted. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

Ordinarily, the Court would take these arguments in turn and first pass judgment on the search's constitutionality before considering whether the search was done pursuant to an official policy or custom. But the Court has discretion to address them in any order it prefers. *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1 (2023); *cf. Pearson v. Callahan*, 555 U.S. 223, 236 (2009). With this discretion in mind, the Court believes it prudent to resolve this motion on the narrow—and simple—question of whether the allegedly unconstitutional search occurred pursuant to an official policy or custom. The Court thus assumes without deciding that the search violated Plaintiffs' Fourth Amendment rights and skips straight to whether Defendant can be held liable for the search under *Monell*.

A.

Plaintiffs bring their *Monell* claim under 42 U.S.C. § 1983. That statute "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Franklin v. City of Charlotte*, 64 F.4th 519, 530 (4th Cir. 2023) (quoting *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013)).

The Supreme Court has held that "[m]unicipalities are 'persons' within the meaning of § 1983" and thus amenable to suit under the statute. *Id.* at 535 (citing *Monell*, 436 U.S. at 690). That said, municipalities cannot be held vicariously liable for their employees' actions under § 1983. *Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020). Instead, municipalities can be held liable under § 1983 only when the municipality itself inflicts the

constitutional injury. *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). A municipality can inflict a constitutional injury by adopting a "policy" or "custom," which is the "moving force" behind the constitutional injury. *Monell*, 436 U.S. at 694–95; *see also Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) ("[N]ot every deprivation of a constitutional right will lead to municipal liability. Only in cases where the municipality causes the deprivation 'through an official policy or custom' will liability attach." (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam))).

The Fourth Circuit has recognized four different ways a municipality may adopt a policy or custom sufficient to trigger municipal liability:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle*, 326 F.3d at 471 (alteration in original). Importantly, aggrieved plaintiffs need to prove more than the policy or custom's existence; they must also prove that the policy or custom *caused* their constitutional injury. *Franklin*, 64 F.4th at 536 ("No matter which of these [four *Lytle*] paths a plaintiff takes, the 'official policy' itself must 'inflict[]' the alleged injury for the municipality to be liable under § 1983." (second alteration in original)).

B.

Plaintiffs allege the existence of two policies or customs that, in their view, caused the illegal search here. First, Plaintiffs allege that Defendant has "instituted an official policy, custom, and practice whereby members of the [KCSD] . . . routinely work with the U.S. Marshal

6

Service as part of a joint task force." (ECF No. 1 at 6, ¶ 28.) Second, Plaintiffs allege that Defendant has an "official policy, custom, and practice of [allowing KCSD officers to] conduct[]" unconstitutional searches. (*Id.* at 6, ¶ 29.) Neither suffice.

1.

Taking things in reverse order, Plaintiffs have failed to adequately allege that Defendant has adopted an official policy or custom of allowing KCSD officers to conduct unconstitutional searches. In their complaint, Plaintiffs do not allege, much less identify, the existence of an official, written policy doing so, nor do they claim that a person with final policymaking authority authorized unconstitutional searches. (*See* ECF No. 1 at 6, ¶ ¶ 27–31.) That leaves them with only the latter two *Lytle* avenues to pursue.

i.  Failure to Train

Plaintiffs, however, have not adequately alleged a failure to train. To do so, they needed to (1) "point out 'a specific deficiency' in [KCSD officers'] training," as opposed to "general laxness or ineffectiveness in [their] training." *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987), and (2) allege that Defendant knew about the specific deficiency and failed to correct it, *Deavers v. Martin*, 629 F. Supp. 3d 389, 407 (S.D. W. Va. 2022) (explaining that a "[f]ailure to train can only form a basis for [*Monell*] liability if 'it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 397 (1989) (O'Connor, J., concurring in part and dissenting in part)). Plaintiffs' complaint does neither. Nowhere does it allege—much less describe—a deficiency in the officers' training. Nor does

Plaintiffs' complaint ever allege that Defendant knew about a deficiency and failed to correct it. Thus, Plaintiffs have failed to allege a failure to train claim.[6]  *Deavers*, 629 F. Supp. 3d at 407.

      ii.      Widespread Practice

Plaintiffs have also failed to adequately allege the existence of a widespread, persistent practice of KCSD conducting unconstitutional searches that amounts to a "custom." To do that, they needed to allege "a pattern of comparable practices [that] ha[ve] become actually or constructively known to responsible policymakers." *Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (quoting *Spell*, 824 F.2d at 1391). In other words, Plaintiffs needed to allege the existence of "a 'persistent and widespread practice'" of KCSD officers conducting unconstitutional searches, "the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386–91). That means "[s]poradic or isolated" incidents will not suffice; "only 'widespread or flagrant' violations will" do. *Id.* at 403.

Here, Plaintiffs have not alleged *any other* incidents where KCSD officers conducted unconstitutional searches. Theirs is the only one mentioned in the complaint, and that lone incident, standing on its own, cannot create a widespread custom. *Howard*, 68 F.4th at 954 (holding that the "single incident of the unconstitutional activity charged [in the plaintiff's complaint] [wa]s not sufficient to prove the existence of a municipal custom").

---

[6] Plaintiffs briefly argue that their failure to train claim must survive dismissal because "the reasonableness of the [KCSD] officers['] actions are clearly in question." (ECF No. 13 at 4.) That's beside the point. Even if the KCSD officers who barged into Plaintiffs' home acted unreasonably and thus violated the Fourth Amendment, Plaintiffs have not alleged any facts showing that a failure to train that led to this constitutional violation.

Plaintiffs implicitly concede this deficiency by saying that they intend to use discovery to identify other instances of unconstitutional conduct. (ECF No. 13 at 4.) However, it is well-settled that inadequately pled claims "do[] not unlock the doors of discovery." *Iqbal*, 556 U.S. at 678–79; *see also McCants v. Tolliver*, No. 1:11-cv-0664, 2011 WL 2893058, at *6 (N.D. Ohio July 15, 2011) ("[W]hen a plaintiff files a complaint that fails to state a claim as a matter of law, he cannot complain that he is entitled to discovery to state his claim. In the absence of a cognizable claim, Plaintiff has no right to any discovery."). Because Plaintiffs failed to allege sufficient facts in their complaint to state a *Monell* claim, they have no right to discovery on that claim. *Cf. Shields v. Tibbs*, No. 2:23-cv-00491, 2024 WL 1804388, at *4 (S.D. W. Va. Apr. 25, 2024).

2.

Plaintiffs' other allegation—that Defendant has a policy that allowed KCSD officers to work jointly with the U.S. Marshals—fails on causation grounds. That is, even assuming Defendant has adopted this express policy, Plaintiffs still failed to allege that the policy caused their Fourth Amendment injury.

An express policy may cause a constitutional violation in one of two ways. The most obvious way occurs when the policy itself is unconstitutional, *i.e.*, it "directly commands or authorizes constitutional violations." *Spell*, 824 F.2d at 1387; *see also Todman v. Mayor & City Council of Balt.*, 104 F.4th 479, 495 (4th Cir. 2024). Alternatively, a facially constitutional policy may nevertheless cause a constitutional violation when there is "a close causal connection between the [policy] and the ultimate constitutional injury inflicted." *Jones v. Wellham*, 104 F.3d 620, 625 (4th Cir. 1997). Establishing this close causal connection is no easy task. The Fourth Circuit has

explained that mere allegations "that such a policy . . . was 'likely' to cause a particular violation [are] not sufficient." *Spell*, 824 F.2d at 1388. The plaintiff must instead allege that, because of the policy, "the ultimate violation [was] 'almost bound to happen.'" *Jones*, 104 F.3d at 627 (some internal quotation marks omitted) (quoting *Spell*, 824 F.2d at 1391).

Plaintiffs have not met either test. For starters, there is nothing unconstitutional about local police departments, such as the KCSD, working jointly with the U.S. Marshals. That means Plaintiffs needed to allege some facts showing a close causal connection between the joint task force's existence and their Fourth Amendment injury. Plaintiffs, however, pled nothing to that effect in their complaint, and they made no effort to shed any light on the causal chain in their response brief. The closest they came was in their complaint when they made the boilerplate allegation that the unconstitutional search was a "direct and proximate result" of this policy. (ECF No. 1 at 6, ¶ 31.) Unfortunately for Plaintiffs, that allegation is nothing more than a legal conclusion, which is not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678.

Even assuming, theoretically, that allowing KCSD deputies to work alongside the U.S. Marshals made it possible for the unconstitutional search here to occur, a policy that merely makes a constitutional violation possible—as opposed to a near-certainty—falls far short of satisfying the demanding causal test the Fourth Circuit has laid down. *See Jones*, 104 F.3d at 627.

At bottom, Plaintiffs have failed to allege that the unconstitutional search here occurred pursuant to, and was caused by, an official policy or custom attributable to Defendant. They have therefore failed to state a *Monell* claim against Defendant and Count II must be dismissed.

\*　　　\*　　　\*

Having handled Defendant's motion to dismiss, the Court must now address Defendant's counsel's sanctionable conduct. As noted earlier, Defendant asked this Court to find that the officers did not violate the Fourth Amendment when they entered and searched Plaintiffs' home without a search warrant. The officers did not need a search warrant to do so, Defendant's counsel argued, because the officers had an arrest warrant for Laurel Wolfe and thus reasonably believed that she lived there and would be found there.[7] (ECF No. 11 at 4–7; ECF No. 14 at 1–3.) In making this argument, Defendant's counsel materially misrepresented the law in hopes of skirting unfavorable binding authority.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches." U.S. Const. amend. IV. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (internal quotation marks omitted) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "With few exceptions," then, "the question whether a warrantless search of a home is

---

[7] In support of this argument, Defendant's counsel attached to their motion a purported arrest warrant for Laurel Wolfe, which they claimed listed her address as being Plaintiffs' home address. (ECF No. 10-3.) While Counsel correctly recognized that courts ordinarily cannot consider documents not attached to the complaint, they nevertheless assured the Court that it would be appropriate to do so here. This would have been proper, counsel claimed, because "Plaintiffs have expressly brought into question the existence and contents" of the arrest warrant and it should therefore be treated "as if attached . . . to the[] Complaint." (ECF No. 11 at 3 n.10.) Tellingly, though, they cited no law supporting this novel theory of incorporation by reference—likely because that is *not* the law. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (explaining that courts may "consider a document submitted by the [party seeking dismissal] that was not attached to or expressly incorporated in a complaint" only when "[1] the document was integral to the complaint and [2] there is *no dispute about the document's authenticity*" (emphasis added)). The warrant was neither integral nor undisputed. However, even if the Court had taken the bait and erroneously treated this motion as one for summary judgment, the Court still could not have found that the arrest warrant listed Laurel Wolfe's address as Plaintiffs' home address—because counsel *redacted* the address on the provided warrant. (*See* ECF No. 10-3.)

11

reasonable and hence constitutional must be answered no." *Id.*; *see also Payton v. New York*, 445 U.S. 573, 586 (1980) (recognizing the "basic principle of Fourth Amendment law that searches . . . inside a home without a warrant are presumptively unreasonable." (internal quotation marks omitted)).

So absent a few narrow exceptions that aren't relevant here, officers need a warrant to enter and search the home. Not every warrant unlocks the front door. Search warrants do, so long as they particularly describe the place to be searched and the thing or person to be seized there. *United States v. Blakeney*, 949 F.3d 851, 862 (4th Cir. 2020) (quoting *United States v. Grubbs*, 547 U.S. 90, 97–98 (2006)). However, arrest warrants, standing on their own, don't always work. That is, when officers intend to execute an arrest warrant on a suspect in what they reasonably believe is the suspect's own home, they still need "reason to believe [she] is within" before they can barge in.[8] *Payton*, 445 U.S. at 603. Put in legalese, officers armed with only an arrest warrant cannot enter a house to search for and arrest a suspect unless they "have reason to believe" (1) "that the [house] is the [suspect]'s residence" and (2) "that [s]he [will] be home" when they enter. *United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011).

That begs the question: what does "reason to believe" mean? Is it another way of saying "reasonable suspicion" and thus the same standard that courts apply when analyzing *Terry*[9] stops? Could it perhaps mean probable cause? If neither of those, is it a third, yet-undefined standard

---

[8] If officers intend to execute an arrest warrant on a suspect in what they think is a third-party's home, they need both an arrest warrant for the suspect and a search warrant for the third-party's home. *Steagald v. United States*, 451 U.S. 204 (1981). The complaint, as pled here, suggests that the officers subjectively—but mistakenly—believed that Laurel Wolfe lived at Plaintiffs' home. For that reason, *Payton* would apply here to the exclusion of *Steagald*.
[9] *Terry v. Ohio*, 392 U.S. 1 (1968).

12

that lies somewhere between reasonable suspicion and probable cause?  The Supreme Court never has clarified *Payton*'s "reason to believe" language.

Recognizing that this Court might be inclined to apply the higher probable cause standard when ruling on the Fourth Amendment issue this case presented, Defendant's counsel said it would be a mistake to do so.  This would have been error, Defendant's counsel declared, because "[c]ourts have *universally rejected* any suggestion that [this] 'reason to believe' [standard] is anywhere near 'probable cause.'"  (ECF No. 11 at 5 (emphasis added) (citing *State v. Pennington*, 885 S.E.2d 569, 575 (W. Va. 2022), *cert. denied*, 143 S. Ct. 2493 (2023)).)  Citing only *Pennington*, a non-binding case from the West Virginia Supreme Court, Defendant's counsel claimed that there is a consensus among courts that the "reason to believe" standard is "less stringent" than probable cause.  (*Id.* at 5–6 (quoting *Pennington*, 885 S.E.2d at 575).)

This couldn't be further from the truth.  Indeed, as *Pennington* itself recognized, courts are deeply divided on "[t]he issue of what quantum of proof is necessary to satisfy th[is] reason to believe standard."  885 S.E.2d at 575.  Some courts have expressly adopted the probable cause metric.  *See, e.g.*, *United States v. Vasquez-Algarin*, 821 F.3d 467, 477 (3d Cir. 2016) (holding "that *Payton*'s 'reason to believe' language amounts to a probable cause standard"); *United States v. Gorman*, 314 F.3d 1105, 1114–15 (9th Cir. 2002) (holding "that the 'reason to believe' . . . standard of *Payton* . . . should be read to entail the same protection and reasonableness inherent in probable cause"); *see also Commonwealth v. Romero*, 183 A.3d 364, 394 (Pa. 2018) (plurality opinion) (holding that *Payton* requires probable cause); *State v. Ruem*, 313 P.3d 1156, 1160 (Wash. 2013) (same); *State v. Thomas*, 124 P.3d 48, 52 (Kan. 2005) (same); *State v. Jones*, 667 A.2d 1043, 1047 (N.J. 1995) (same); *State v. Davis*, 834 P.2d 1008, 1014 (Or. 1992) (same); *People v. White*,

512 N.E.2d 677, 682 (Ill. 1987) (same); *State v. Smith*, 90 P.3d 221, 224 (Ariz. Ct. App. 2004) (same). Others have expressed a desire to do so when the time comes. *See, e.g.*, *United States v. Jackson*, 576 F.3d 465, 469 (7th Cir. 2009) (expressing in *dicta* an "inclin[ation] to adopt the view of the *narrow majority* of . . . [C]ircuits that 'reasonable belief' is synonymous with probable cause" (emphasis added)); *United States v. Hardin*, 539 F.3d 404, 416 n.6 (6th Cir. 2008) (explaining in *dicta* why "probable cause is the correct standard [under *Payton*]").

Not only have a dozen or so courts accepted a position that Defendant's counsel claimed no court had ever taken, the Fourth Circuit stands among them. In *United States v. Brinkley*, 980 F.3d 377 (4th Cir. 2020), the Fourth Circuit waded into the fray and considered whether *Payton* requires probable cause or something less. In a thorough, well-reasoned, and *binding* opinion, the Court found two compelling reasons to read *Payton* as requiring probable cause. First, the Court explained "that the Supreme Court itself has often used language apparently equating 'reason to believe' with probable cause." *Id.* at 385 (citing *Cardwell v. Lewis*, 417 U.S. 583, 592 (1974), as just one example where "the [Supreme] Court concluded that 'police had probable cause to search [a] car' when observations gave them 'reason to believe that the car was used in the commission of [a] crime.'" (first alteration added)). Second, the Court reasoned that a reading of *Payton* that requires officers to have probable cause before entering a suspect's home is "most consistent with the special protections that the Constitution affords to the home." *Id.* (noting that "*Payton* itself reiterated that 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (quoting *Payton*, 445 U.S. at 585)). For those reasons, the Fourth Circuit "join[ed] those courts that have held that reason[] [to believe] in the *Payton* context

14

embodies the same standard of reasonableness [as that] inherent in probable cause." *Id.* at 386 (internal quotation marks omitted).

*Brinkley* thus binds this Court and would have required the Court to apply the probable cause standard when analyzing the Fourth Amendment issue here. But, in their briefing on the motion to dismiss, Defendant's counsel never once mentioned *Brinkley*. They instead tried to sweep *Brinkley* under the rug by pushing this Court to follow *Pennington*—a non-binding state court case on the other side of the split—and claiming that courts "universally" agree with *Pennington*'s contrary, more-favorable holding.[10] (ECF No. 11 at 5.) Doubtless, counsel did so thinking they could dupe this Court into overlooking Fourth Circuit precedent, committing clear legal error, and blessing a likely-illegal search by applying a legal standard that the Fourth Circuit has unequivocally rejected. That takes nerve.

But what's most galling is that *Pennington* explains all of this. Indeed, *Pennington* itself recognized the deeply entrenched split over *Payton*'s "reason to believe" standard, 885 S.E.2d at 575, and *Pennington* itself grappled with *Brinkley* and recognized that the Fourth Circuit adopted the probable cause standard, *id.* at 577 n.18. Did counsel expect the Court to take their briefing as gospel? Did counsel not expect the Court to (1) do its own research when deciding this motion, or (2) even bother reading the lone case they cited in support of their position?

Either way, Defendant's counsel have crossed the line from zealous advocacy to flouting their unflagging duty of candor to the Court. Loc. R. Civ. P. 83.7; W. Va. R. Prof. Cond. 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of . . . law to a tribunal."). So, Defendant's counsel are hereby **ORDERED** to **SHOW CAUSE** as to why they should not be

---

[10] In their reply brief, Defendant's counsel went so far as describing the "reason to believe" standard being "exceptionally low." (ECF No. 14 at 2.)

15

sanctioned for materially misrepresenting the law to this Court. Counsel's response shall be due within 10 days of entry of this Memorandum Opinion and Order.

## IV.	CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is **GRANTED**. (ECF No. 10.) Defendant is hereby **DISMISSED** from this case.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:	July 15, 2024

_____
THOMAS E. JOHNSTON, CHIEF JUDGE