IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JASON WICKLINE, et al.,

        Plaintiffs,

v.                                                      CIVIL ACTION NO. 2:23-cv-00799

CPL. T. J. CUMBERLEDGE, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant T. J. Cumberledge's ("Defendant") motion to dismiss. (ECF No. 17.) For the reasons more fully explained below, the motion is **GRANTED**.

        I.        BACKGROUND

This case currently sits at the motion to dismiss stage, so the Court briefly recounts the pertinent alleged facts and assumes them to be true.[1]

In late 2021, authorities were searching for Laurel Wolfe. (*See, e.g.*, ECF No. 1 at 2–3, ¶¶ 8–9.) She had a warrant out for her arrest and could not be found. (*Id.* at 3, ¶ 12.) Defendant and two other officers from the Kanawha County Sheriff's Department—acting as temporarily deputized United States Marshals on a joint task force—planned to execute that arrest warrant one afternoon. (*See id.* at 4, ¶ 13.) The officers thought they might find Ms. Wolfe at Plaintiffs'

---

[1] If any reader would like a more detailed recitation of the curious facts giving rise to this case, please see this Court's previous Memorandum Opinion and Order. *Wickline v. Cumberledge*, No. 2:23-cv-799, 2024 WL 3416282, at *1–2 (S.D. W. Va. July 15, 2024).

house, so they headed that way. (*See id.*) Once there, the officers found the door unlocked, let themselves in, and searched the entire house. (*Id.* at 3–4, ¶¶ 12–13.) But they didn't find Laurel Wolfe—likely because she did not live there and had not lived there for several years. (*Id.* at 3, ¶ 10.)

Plaintiffs later learned of this search and filed suit. (ECF No. 1.) As relevant here, they sued Defendant in his individual capacity, alleging that he violated their Fourth Amendment right to be free from unreasonable searches.[2] (*Id.* at 4–6, ¶¶ 17–26.) Plaintiffs seek money damages, attorneys' fees, and costs. (*Id.* at 8.)

Defendant has moved to dismiss. (ECF No. 17.) He argues that, because he was acting as a federal official at the time of the search,[3] Plaintiffs do not have a cause of action against him. (ECF No. 18 at 4–16.) More specifically, Defendant argues that (1) Plaintiffs do not have an express statutory cause of action, and (2) they cannot satisfy the Supreme Court's rigorous test necessary for finding an implied cause of action for money damages, as first recognized in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and refined in later cases. (*Id.*) The motion has since been fully briefed and is now ripe for adjudication. (ECF Nos. 18, 23, & 27.)

## II.   LEGAL STANDARD

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint. Fed. R. Civ. P. 12(b)(6). A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim. *Bell Atl. Corp.*

---

[2] Plaintiffs also sued John Does 1, 2, and 3 for identical Fourth Amendment claims, as well as the Kanawha County Commission for negligence and a *Monell* claim.
[3] Plaintiffs do not dispute that Defendant's status as a deputized United States Marshal during the search makes him a federal actor. *See, e.g.*, *Henry v. Essex County*, 13 F.4th 355, 360–61 (3d Cir. 2024).

*v. Twombly*, 550 U.S. 544, 554–55 (2007). A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In applying this standard, a court must utilize a two-pronged approach. First, it must separate the legal conclusions in the complaint from the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.* Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

### III. DISCUSSION

"The *Bivens* story is by now a familiar one." *Mays v. Smith*, 70 F.4th 198, 202 (4th Cir. 2023). In 1871, Congress passed legislation, now codified at 42 U.S.C. § 1983, which provides plaintiffs with a cause of action for money damages against any state official who violates their constitutional rights. *Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017); *Bulger v. Hurwitz*, 62 F.4th 127, 135 (4th Cir. 2023). However, Congress has not passed legislation providing an analogous cause of action against federal officials. *Ziglar*, 582 U.S. at 130; *Tun-Cos v. Perrotte*, 922 F.3d 514, 520 (4th Cir. 2019) (noting that "§ 1983 does not provide a cause of action against federal officials,

3

and there is no analogous statute imposing damages liability on federal officials" (emphasis omitted)).

The Supreme Court filled this gap in *Bivens*. There, Federal Bureau of Narcotics agents stormed into a man's apartment, searched it high and low, arrested the man, and threatened his family's arrest. *Bivens*, 403 U.S. at 389. He later sued the agents, alleging they had neither a warrant nor probable cause for the search and his arrest, and thus violated his Fourth Amendment rights to be free from unreasonable searches and seizures. *Id.* In determining whether he could bring suit, the Court observed that "the Fourth Amendment does not in so many words provide" a cause of action for its enforcement. *Id.* at 396. Nevertheless, the Court found that "where federally protected rights have been invaded," general principles of federal jurisdiction gave it the authority to fashion "any available remedy to make good the wrong done." *Id.* at 392, 396 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). With that authority in hand, the Court held that the Fourth Amendment contained an implied cause of action to sue federal officials for money damages to redress Fourth Amendment violations. *Id.* at 397.

*Bivens* fared well at first, and the Court even extended it twice over the next few years. In *Davis v. Passman*, 442 U.S. 228 (1979), for instance, the Court approved a claim for money damages under the Fifth Amendment's Due Process Clause, where a female administrative assistant alleged that her boss, a congressman, had fired her for being a woman, thereby violating her right to the equal protection of the laws. In *Carlson v. Green*, 446 U.S. 14 (1980), the Court similarly authorized a claim for deliberate indifference under the Eighth Amendment, where federal prison officials failed to treat an inmate's asthma, which caused his death.

But *Bivens* has since fallen out of favor with the Supreme Court. *Dyer v. Smith*, 56 F.4th 271, 277 (4th Cir. 2022) (observing that "the Supreme Court [has] all but closed the door on *Bivens* remedies"); *see also Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1355 (10th Cir. 2024) (remarking that the Supreme Court "is on course to treating *Bivens* as a relic of the 20th century"). Indeed, in the more than four decades since *Carlson*, the Supreme Court "has 'consistently rebuffed' every request—12 of them now—to find implied causes of action against federal officials for money damages under the Constitution." *Tate v. Harmon*, 54 F.4th 839, 843 (4th Cir. 2022); *see also Egbert v. Boule*, 596 U.S. 482, 486 (2022) (collecting cases).

This slow, informal burial of *Bivens* can be chalked up to the Court's "notable change in" its "approach to recognizing implied causes of action." *Ziglar*, 582 U.S. at 135; *Annappareddy v. Pascale*, 996 F.3d 120, 133 (4th Cir. 2021). As the Supreme Court recently explained, *Bivens* and its progeny were decided in "the heady days in which th[e] Court assumed common-law powers to create causes of action." *Egbert*, 596 U.S. at 491 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring)). Those days have long since passed, though, and the Court has now come "to appreciate more fully the tension between th[at] practice and the Constitution's separation of legislative and judicial power." *Hernandez v. Mesa*, 589 U.S. 93, 100 (2020). "[C]reating a cause of action is a legislative endeavor," the Court has said, *Egbert*, 596 U.S. at 491, and "court[s] risk[] arrogating [the] legislative power" when they themselves begin weighing costs and benefits, fashioning remedies, and doling out implied causes of action to right wrongs, *Hernandez*, 589 U.S. at 100; *see also Zigler*, 582 U.S. at 133 ("[I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against

5

federal officials in order to remedy a constitutional violation."). This heightened appreciation for the separation of powers has led the Court, over the last seven years, to "hand[] down a trilogy of opinions not only expressing regret over its *Bivens* cases but also demonstrating hostility to any expansion of them." *Tate*, 54 F.4th at 843; *see also Ziglar*, 582 U.S. at 134 (noting that "the Court's three *Bivens* cases might have been [decided] different[ly] if they were decided today"). These cases—*Ziglar*, *Hernandez*, and *Egbert*—emphasize "that recognizing a cause of action under *Bivens* is not only 'a disfavored judicial activity,'" *Egbert*, 596 U.S. at 491 (quoting *Ziglar*, 582 U.S. at 135), but also "an extraordinary act" that should be taken only in the rarest of circumstances, *id.* at 497 n.3 (quoting *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 636 (2021)); *Mays*, 70 F.4th at 202 (observing that a *Bivens* remedy "will be unavailable 'in most every case'" (quoting *Egbert*, 596 U.S. at 492)); *Silva v. United States*, 45 F.4th 1134, 1140 (10th Cir. 2022) ("[W]e are left in no doubt that expanding *Bivens* is not just 'a disfavored judicial activity,' it is an action that is impermissible in virtually all circumstances." (internal citation omitted)).

Against this backdrop, the Supreme Court has now adopted a "highly restrictive" two-step inquiry that courts must perform before finding an implied cause of action for money damages and thus authorizing a new *Bivens* claim. *Mays*, 70 F.4th at 202; *see also Earle v. Shreves*, 990 F.3d 774, 778 (4th Cir. 2021) ("[T]he analytical framework established by the *Ziglar* Court places significant obstacles in the path to recognition of an implied cause of action [under *Bivens*]."). At the first step, courts must determine whether the plaintiff's claim is identical to any of the three previously-approved *Bivens* actions or, instead, is meaningfully different—*i.e.*, it "arises in a 'new context' or involves a 'new category of defendant[].'" *Bulger*, 62 F.4th at 137 (quoting *Hernandez*, 589 U.S. at 102). If the claim matches *Bivens*, *Davis*, or *Carlson*, it may proceed.

6

*See id.* But if the claim is somehow different, courts must proceed to step two, where they ask whether any "special factors counsel[] hesitation" before implying a new cause of action "in the absence of affirmative action by Congress." *Ziglar*, 582 U.S. at 136 (quoting *Carlson*, 446 U.S. at 18). A new *Bivens* claim will survive step two only in those rare instances where "the Judiciary is well suited . . . to consider and weigh the costs and benefits of allowing a [novel] damages action to proceed." *Id.* Put differently, should a court find itself ill-equipped to balance the various interests implicated by recognizing a new cause of action, it must leave the balancing act to Congress. *Egbert*, 596 U.S. at 492 (stating that "no *Bivens* action may lie" "[i]f there is a [single] rational reason to think that" Congress is better suited than the Judiciary "to provide . . . a damages remedy" for constitutional violations).

With this analytical framework sketched out, the Court will now conduct the two-step inquiry and determine whether Plaintiffs have a cause of action for their Fourth Amendment claim.

A.

The Court must first determine whether this case matches any previously-approved *Bivens* action or is meaningfully different from each. Here, this case is most analogous to *Bivens*[4] itself and, at first blush, seems to track *Bivens* quite well. Indeed, in both cases, field-level federal law enforcement officers allegedly entered and searched a family's home without the proper warrant. Also in both cases, the plaintiffs alleged that these searches violated their Fourth Amendment right to be free from unreasonable searches. For all these similarities, though, there are still a handful of differences that distinguish this case from *Bivens*.

---

[4] It goes without saying that neither *Davis* nor *Carlson* are analogous to Plaintiffs' Fourth Amendment claim and thus lend no support. *Davis*, 442 U.S. at 230 (Fifth Amendment claim for sex discrimination in the workplace); *Carlson*, 446 U.S. at 16 (Eighth Amendment claim for inadequate medical treatment in prison).

For starters, this cases arises in a different context. It may be true that this case, just like *Bivens*, arises from an allegedly unreasonable search. But that similarity does not end the inquiry. After all, "[c]ourts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'"[5] *Annappareddy*, 996 F.3d at 135 (quoting *Cantu v. Moody*, 933 F.3d 414, 422 (5th Cir. 2019); *Mays*, 70 F.4th at 204 ("[C]itation to the constitutional provision alone is insufficiently granular for the new-context inquiry."). Courts must instead scrutinize every last detail of a prospective *Bivens* claim, nitpicking it for even a single "meaningful difference" between it and the Supreme Court's three *Bivens* cases. *Logsdon*, 91 F.4th at 1355 ("The [Supreme] Court has said in effect that almost any difference between the case at hand and the three [*Bivens*] precedents can justify rejecting a cause of action." (citing *Egbert*, 596 U.S. at 503 (Gorsuch, J., concurring in judgment))); *see also Bulger*, 589 62 F.4th at 137 ("The Supreme Court has warned lower courts to act with utmost hesitation when faced with actions that do not fall *precisely* under *Bivens*." (emphasis added)). To help lower courts carrying out this unenviable task, the Supreme Court "has set out a non-exhaustive list of potentially meaningful differences, 'some of which are quite minor'":

> [1] the rank of the officers involved; [2] the constitutional right at issue; [3] the generality or specificity of the official action; [4] the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [5]

---

[5] Despite this clear directive, Plaintiffs argue that the Court should define the *Bivens* context at the Fourth Amendment level and find that their case does not present a new context. (ECF No. 23 at 4.) In fairness to Plaintiffs, doing so is not entirely unprecedented. Just two years ago, this Court let a near-identical *Bivens* claim survive where the plaintiff alleged that a Deputy Marshal had illegally searched and seized her without a proper warrant. *Deavers v. Martin*, 629 F. Supp. 3d 389 (S.D. W. Va. 2022) (Johnston, C.J.). In authorizing her claim, this Court reasoned that the plaintiff's case was "not an extension of *Bivens* so much as a replay" because she merely sought "redress for the alleged unreasonable search and seizure committed by federal officers." *Id.* at 402 (quoting *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir. 2020)). However, as this Memorandum Opinion and Order makes clear, that scant analysis was done at far too high a level of generality, and it cannot be squared with *Ziglar*, *Hernandez*, or *Egbert*. So, while the Court would ordinarily follow its previous decision on a near-identical legal issue, the Court "see[s] no reason why [it] should be consciously wrong today [simply] because [it] was unconsciously wrong yesterday." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 102 (2014) (Scalia, J., dissenting) (quoting *Massachusetts v. United States*, 333 U.S. 611, 639–40 (1948) (Jackson, J., dissenting)).

the statutory or other legal mandate under which the officer was operating; [6] the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or [7] the presence of potential special factors that previous *Bivens* cases did not consider.

*Annappareddy*, 996 F.3d at 133 (quoting *Tun-Cos*, 922 F.3d at 522).

This case features two key differences. First, unlike *Bivens*, where federal narcotics officers conducted a warrantless search to enforce federal drug laws, the officers here were operating as part of a joint federal-state task force to execute an arrest warrant and apprehend a fugitive. The deputized Marshals were thus acting for a different purpose—*i.e.*, operating under a different legal mandate—than the *Bivens* narcotics officers. *Logsdon*, 91 F.4th at 1358 ("The USMS is statutorily required to partner with state and local law-enforcement authorities to create Fugitive Apprehension Task Forces" (citing 34 U.S.C. § 41503(a))); *see also Robinson v. Sauls*, 102 F.4th 1337, 1344–45 (4th Cir. 2024) (detailing the history and purpose of the United States Marshals Service).

Second, unlike the warrantless search in *Bivens*, the officers here searched pursuant to a valid arrest warrant. While reasonable minds may disagree whether the presence of a warrant should matter much, *Logsdon*, 91 F.4th at 1357–58, the Fourth Circuit has found it significant, *Annappareddy*, 996 F.3d at 135–36. An arrest warrant makes a world of difference, the Court has said, because "the Fourth Amendment sharply distinguishes between with-warrant and warrantless searches." *Id.* This sharp distinction is anything but academic—it fundamentally alters a case. That is, Fourth Amendment claims for with-warrant searches are governed by different legal standards than warrantless searches, *compare Payton v. New York*, 445 U.S. 573 (1980), *and Steagald v. United States*, 451 U.S. 204 (1981), *with Kentucky v. King*, 563 U.S. 452 (2011), which means that officers have different (and at times conflicting) judicial guidance on how and when to

9

conduct with-warrant searches, *Wickline v. Cumberledge*, No. 2:23-cv-799, 2024 WL 3416282, at *6–8 (S.D. W. Va. July 15, 2024), and plaintiffs must present different evidence and satisfy different legal tests to show that a with-warrant search was unreasonable. Plaintiffs' Fourth Amendment claim here would thus revolve around different legal and factual issues than *Bivens*. That is enough to present a new context. *Cain v. Rinehart*, No. 22-cv-1893, 2023 WL 6439438, at *3 (6th Cir. July 25, 2023) (unpublished) (collecting cases where courts "have found that the existence of a warrant creates a new context for *Bivens* purposes").

This case is also meaningfully different because it features a "new category of defendant[]." *Hernandez*, 589 U.S. at 102. *Bivens*, of course, involved agents from the Federal Bureau of Narcotics. Here, by contrast, Plaintiffs are suing temporarily deputized United States Marshals. The Supreme Court has never authorized an implied cause of action against the Marshals Service, which means this suit falls beyond *Bivens*' ambit. *Robinson*, 102 F.4th at 1344 ("Officers participating in a USMS joint task force are a new category of defendants."); *Logsdon*, 91 F.4th at 1358 ("[A]gents of the USMS are a new category of defendant.").

To be sure, one could reasonably question what difference it should make which windbreaker federal agents wear when they invade the privacy of one's home, so long as they do so while cloaked in federal authority. *See Egbert*, 596 U.S. at 503–04 (Gorsuch, J., concurring in judgment). The Supreme Court, however, has said that this difference implicates separation-of-powers concerns and thus demands judicial restraint. *Ziglar*, 582 U.S. at 135. This Court, as an inferior court, must heed that warning. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001). So the Court concludes, as it must, that this case is meaningfully different from *Bivens*.

B.

Having found that Plaintiffs' case differs from *Bivens*, the Court must now determine whether there are any special factors here that counsel against extending *Bivens*. This special factors inquiry "focus[es] on 'separation-of-powers principles' and 'requires courts to ask whether judicial intrusion into a given field is appropriate.'" *Mays*, 70 F.4th at 202 (quoting *Bulger*, 62 F.4th at 137). Because extending *Bivens* "is an extraordinary act that places great stress on the separation of powers," *Egbert*, 596 U.S. at 497 n.3 (quoting *Nestlé*, 593 U.S. at 636), courts must not create a new damages remedy if there is a single reason to pause before doing so, *Bulger*, 62 F.4th at 137 ("[W]here there is 'reason to pause before applying *Bivens* in a new context or to a new class of defendants,' a court should not extend *Bivens*." (quoting *Hernandez*, 589 U.S. at 102)). The Supreme Court has never nailed down every special factor that might cause a court to pause, but it has identified several over the years. *Egbert*, 596 U.S. at 492–93. These include uncertainty as to the systemwide consequences of creating a novel damages remedy, as well as the existence of alternative remedial schemes that already address the complained of misconduct. *Bulger*, 62 F.4th at 140. Both exist here.

The Court will start with the possible systemwide effects of extending *Bivens* to cover state-and-federal joint task forces. As the law currently stands, there is no private cause of action for monetary damages against individual Deputy Marshals who commit constitutional violations while on a fugitive-apprehension task force. *Robinson*, 102 F.4th at 1345. As far as the Court can tell, the Marshals Service currently has no problem recruiting local officers to participate in these joint task forces. But if the Court were to sign off on a new cause of action—and expose individual officers to personal liability and burdensome litigation—the Court would run the risk

of chilling participation in these task forces and thus interfering with the vital Executive Branch responsibility of apprehending and prosecuting fugitives. *Id.* ("Recognizing a cause of action for money damages against a task force member could impact cooperation among law enforcement agencies and the operation of these task forces [and] chill recruitment for the task forces, which could negatively affect their operations in apprehending fugitives at both the state and federal level."); *Logsdon*, 91 F.4th at 1358 ("Chilling participation in joint task forces is . . . a potential cost of expanding *Bivens* to Deputy U.S. Marshals."); *Cain*, 2023 WL 6439438, at *4 ("[A]llowing claims for damages against members of federal fugitive-apprehension task forces could impair the government's recruitment of officers to participate in those task forces and could negatively affect task members' performance of their duties."); *see also Egbert*, 596 U.S. at 499 ("Recognizing any new *Bivens* action 'entail[s] substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987))); *Ziglar*, 582 U.S. at 136 ("[T]he decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself.").

      This is not to say that extending *Bivens* to temporarily deputized Marshals would definitively deter local officers from participating in joint task forces in the future. It's entirely possible that state and federal law enforcement agencies would work out indemnity agreements that shield local officers from personal liability and, in turn, negate any chilling effect. But there's also a possibility that they won't, and "[t]hat uncertainty alone is a special factor that forecloses

12

relief." *Egbert*, 596 U.S. at 493. However, even if the Court had a crystal ball—and knew all the future ramifications of implying a cause of action here—there's still no chance that this Court could "independently assess the costs and benefits" of doing so any better than Congress could. *Id.* at 496. After all, "[w]eighing the costs and benefits of [a] new [cause of action] is the bread and butter of legislative committees," not the federal Judiciary. *Id.* at 503 (Gorsuch, J., concurring in judgment). This unfortunate reality is yet another reason to exercise judicial restraint and refrain from extending *Bivens*.

Bolstering this call for judicial restraint is the existence of two alternative remedial schemes that address the officers' alleged misconduct. *Ziglar*, 582 U.S. at 137 ("[I]f there is an alternative remedial structure [in place], that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."). The Supreme Court has made clear that *Bivens* exists solely "to deter individual federal officers from committing constitutional violations." *Malesko*, 534 U.S. at 70; *see also Egbert*, 596 U.S. at 498. So where, as here, "Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence," "courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Egbert*, 596 U.S. at 498. This is so, the Court has said, even where the remedial scheme is less effective than a *Bivens* remedy would be—or is downright lousy. *Bulger*, 62 F.4th at 140; *see also Egbert*, 596 U.S. at 524 (Sotomayor, J., concurring in judgment in part and dissenting in part). Two alternative remedial schemes exist here, and each independently forecloses Plaintiffs' *Bivens* claim.

The first alternative remedial scheme is the United States Marshals Service's internal grievance procedure. The Director of the Marshals Service is statutorily required to "supervise and direct" the Marshals Service, 28 U.S.C. § 561(g), which includes investigating any "alleged

13

improper conduct on the part of U.S. Marshals Service personnel," 28 C.F.R. § 0.111(n). Aggrieved citizens, such as Plaintiffs, may submit a grievance—and report misconduct—by filling out an online form. *Complaint Regarding United States Marshals Service (USMS) Personnel or Programs*, U.S. Marshals Serv., https://www.usmarshals.gov/sites/default/files/media/document/complaint-form.pdf (last visited Sept. 19, 2024). Complaints against joint task force officers are referred to the Investigative Operations Division, where they are investigated. *Misconduct Investigations*, *Policy Directive 2.3*, U.S. Marshals Serv. 1 (Sept. 7, 2021), https://www.usmarshals.gov/sites/default/files/media/document/usms-policy-directive-misconduct-investigations.pdf. If a joint task force member is found to have "[i]ntentional[ly], reckless[ly] or negligent[ly] violat[ed] [the] rules governing searches and seizures," they are subject to discipline—up to and including reprimand and removal. *Table of Disciplinary Offenses and Penalties*, U.S. Marshals Serv. 6, https://www.usmarshals.gov/sites/default/files/media/document/united-states-marshals-guidance-table-of-disciplinary-offenses-and-penalties.pdf (last visited Sept. 19, 2024).

The second alternative remedial scheme is the Department of Justice's Office of the Inspector General. The Marshals Service is a bureau within the Department of Justice, 28 U.S.C. § 561(a), which makes it subject to the Inspector General's oversight, 5 U.S.C. § 413(b)(2). Much like the Marshals Service's internal grievance procedure, aggrieved citizens can report misconduct to the Inspector General by filling out an online form. *Submitting a Complaint*, U.S. Dep't of Just., Off. of Inspector Gen., https://oig.justice.gov/hotline/submit_complaint (last visited Sept. 19, 2024). If the Inspector General decides to investigate, there's a chance the investigation can "lead to criminal prosecution or civil or administrative action." *Criminal and Civil Cases*, U.S.

Dep't of Just., Off. of Inspector Gen., https://oig.justice.gov/investigations/criminal_and_civil_cases (last visited Sept. 19, 2024). Even if the Inspector General opts not to investigate the alleged misconduct, it can still refer the complaint back to the Marshals Service, where it can be handled internally, and the offending officers remain subject to discipline. *Id.*

Congress and the Executive have deemed these remedial schemes sufficient to deter official misconduct by the Marshals, and Supreme Court precedent forbids this Court from second-guessing that judgment, no matter how desirable doing so may be. *Egbert*, 596 U.S. at 493. These existing remedial schemes are thus another special factor that counsel against extending *Bivens*.

For these reasons, the Court finds that it cannot extend *Bivens* here because there are special factors that counsel against doing so. Plaintiffs thus lack a cause of action, and their claim against Defendant must be dismissed.

\* \* \*

As this case amply illustrates, *Bivens* is zombie precedent. *Mohamed v. Jones*, 100 F.4th 1214, 1240 (10th Cir. 2024) (Tymkovich, J., dissenting) (describing *Bivens* as a "zombi[fied]," "brain-dead cause of action sustained by life support"). The *Bivens* doctrine once provided Americans with a means of vindicating their constitutional rights when federal officials threw caution to the wind and flouted our founding document's most precious guarantees. *Carlson*, 446 U.S. at 18 (broadly holding that "*Bivens* established that the victims of a constitutional violation

15

by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right."). However, the Supreme Court has now walked back the doctrine's protections, cabined *Bivens*, *Davis*, and *Carlson* to their facts, and refused to extend the doctrine to any new set of facts—no matter how cherished or central to our form of self-government the infringed right may be. *See, e.g.*, *Egbert*, 596 U.S. at 498–501 (holding that *Bivens* does not provide a cause of action to redress First Amendment violations by federal officials). What now remains of *Bivens* is a hollow shell of what once stood strong, a pre-determined two-part test that "leaves a door ajar and holds out the possibility that someone, someday might walk through it even [though it is set up so] that . . . no one . . . ever will." *Id.* at 504 (Gorsuch, J., concurring in judgment).

Not only does the current *Bivens* framework invariably lead to wasteful, "protracted litigation destined to yield nothing," *id.* (quoting *Nestlé*, 593 U.S. at 645), it also highlights the need for Congress to authorize a cause of action against federal officials for constitutional violations.[6] After all, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). "One of the first duties of government is to afford that protection," *id.*, and that duty unquestionably lies with Congress, *Egbert*, 596 U.S. at 502–04 (Gorsuch, J., concurring in judgment). *Id.* For more than half a century, though, *Bivens* has seemingly relieved Congress of any need to pass legislation in this area. *See, e.g.*, *Mohamed*, 100 F.4th at 1240 (Tymkovich, J., dissenting). With each shovelful of dirt heaved from *Bivens*' ever-

---

[6] Lest any reader wonder whether Congress already did so with the Federal Tort Claims Act, the answer is no. *Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019) ("[T]he Federal Tort Claims Act . . . does not apply to constitutional violations. It applies to torts, as defined by state law.")

16

deepening grave, the need for Congress to act becomes increasingly apparent. Indeed, though *Bivens* has eluded formal overruling, the Supreme Court has cast it to purgatory and, in effect, left Americans without any means of enforcing their most basic constitutional rights. It is time for Congress to pick up the pen and act.

### IV. CONCLUSION

For these more fully explained above, Defendant's motion to dismiss is **GRANTED**. (ECF No. 17.) Defendant is hereby **DISMISSED** from this case.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: September 27, 2024

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE