## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

JASON WICKLINE, et al.,

                Plaintiffs,

v.                                   CIVIL ACTION NO.   2:23-cv-00799

CPL. T. J. CUMBERLEDGE, et al.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is an order to show cause issued on the Court's own initiative. (ECF No. 29.)   The Court has taken into consideration all the arguments made by counsel and finds the following.

### I.      *BACKGROUND*

The facts of the underlying case are described in more detail in this Court's memorandum opinion and order dismissing the Kanawha County Commission from this case.   (*See* ECF No. 29 at 1–3.)[1]   The facts necessary for this opinion are as follows.   Plaintiffs in this case came home to discover officers from the Kanawha County Sheriff's Department, purportedly acting as Deputy U.S. Marshals, entered and searched the Plaintiffs' home while they were away.   (*Id.* at 2–3.) These officers were armed only with an arrest warrant for one Laurel Wolfe, a person who the warrant erroneously stated lived at Plaintiffs' home.   (*Id.*)   No search warrant had issued.   (*See id.* at 1–3.)   Plaintiffs alleged, *inter alia*, violations of their Fourth Amendment rights stemming

---

[1] Since these litigants only reached the motion to dismiss stage, all of the facts relating to the underlying case are presented in the light most favorable to the Plaintiffs.

from the unreasonable search of their home.    (*Id.* at 3.)    The Court ultimately dismissed defendant Kanawha County Commission because the Plaintiffs failed to properly allege a sufficient policy or custom to support a *Monell* claim.    (*Id.* at 5–10.)    As such, the Court did not need to reach the Fourth Amendment issue to find dismissal was proper.    (*See id.* at 5.)

It was the Commission's briefing on the Fourth Amendment issue that provoked this Court to issue the show cause order.    Attorneys Michael D. Mullins and Robert L. Bailey (collectively "Respondents"),[2] both active members of the West Virginia State Bar, prepared a motion to dismiss the complaint and corresponding memorandum in support.    (ECF Nos. 10 & 11). Mullins and Bailey have about twenty-five and twenty-three years of experience respectively. (ECF No. 32 at 3–4.)    Both are participating members of the same law firm.    (*Id.* at 4.) According to Respondents, Bailey primarily wrote the memorandum at issue in this case, and Mullins ultimately signed it.    (*Id.* at 4.)

The pertinent portion of the brief for purposes of this proceeding is Section II.A.    (ECF No. 11 at 4–7.)    Respondents therein argued that "whether a particular arrest is reasonable under the Fourth Amendment is a two-part test: '[F]irst, there must be a reasonable belief that the location to be searched is the [subject's] dwelling, and second, the police must have 'reason to believe' that the [subject] is within the dwelling.'"    (*Id.* at 5 (citing *State v. Pennington*, 247 W. Va. 631, 637 (2022); *and Payton v. New York*, 445 U.S. 573, 603 (1980)).)    To meet this "reasonable belief" requirement, Respondents claimed that "Courts have universally rejected any suggestion that

---

[2] A third attorney, who will remain unnamed in this order, was also a part of the defendant's litigation team.    However, this more junior attorney "played absolutely no role in this case and, thus, no role in the motion in question."    (ECF No. 32 at 5 n.14.)    The Court appreciates the Respondents' candor on that point.    As such, only Bailey and Mullins are the subjects of this order.

'reasonable belief' or 'reason to believe' is anywhere near 'probable cause.'" (*Id.* at 5.) Mullins and Bailey proceeded to describe a single, non-binding case—*State v. Pennington*—to support this 'universal rejection.' (*Id.* at 5.) That alone is quite odd. One might anticipate a lengthy string-cite to back up such a bold assertion of "universal" harmony.

As the Court soon discovered, the lack of additional cases stemmed from a problem with Respondents' assertion—it was false. Far from being clearly in the defendants' favor, the case law is decidedly divided. *See United States v. Vasquez-Algarin*, 821 F.3d 467, 474–75 (3d Cir. 2016) (collecting cases). The issue arises out of a gap in the United States Supreme Court's ruling in *Payton v. New York*, 445 U.S. 573 (1980). There, the Court held that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."[3] *Id.* at 603. The question left unanswered by the *Payton* Court is what exactly constitutes "reason to believe"? Some courts, including the Supreme Court of Appeals of West Virginia, have answered that question by concluding "[r]eason to believe requires less proof than probable cause," which is established "by evaluating the totality of the circumstances." *Pennington*, 247 W. Va. at 639. Others, like the Fourth Circuit, have found that "reasonable belief in the *Payton* context 'embodies the same standard of reasonableness inherent in probable cause.'" *United States v. Brinkley*, 980 F.3d 377, 386 (4th Cir. 2020) (citations omitted). Although it should not need to be explained to an attorney of twenty-plus years, the latter holding is binding

---

[3] It is from this language that courts have interpreted the two-prong requirement that the Respondents cited. *See United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011) (citing *Payton* and observing that "circuits have [generally] broken the analysis of whether the entry was lawful into two conjunctive parts: (1) whether there is reason to believe that the location is the defendant's residence, and (2) whether or not there was a 'reasonable belief' that he would be home").

on this Court and the former is not.   In any event, the case law certainly was not "universal" as Respondents claimed.

Nevertheless, Respondents went ahead and filed their brief with these false assertions. The Court, after conducting its own inquiry, discovered the Respondents' misrepresentations and ordered them to show cause as to why they should not be sanctioned.   (ECF No. 29.) Respondents filed their response to the show cause order, (ECF No. 32), and the Court held a hearing on August 14, 2024.   The matter is now ripe for adjudication.

## II.    ANALYSIS

### A.  Excuses Offered by Respondents

Respondents' first set of excuses came from their verified response.   According to that filing, Mullins's initial review of the instant case came early in 2024.   (ECF No. 32 at 3.)   His review yielded two issues for research: a "*Monell* issue" and a "Fourth Amendment issue regarding the officers' entry into Plaintiffs' residence with only an arrest warrant."   (*Id.*)   Mullins admitted that "he was less familiar with this particular Fourth Amendment issue" and wisely elected to research that issue further.   (*Id.*)   However, the next series of choices made were unwise. Mullins asserted he "read both *Pennington* and *Brinkley*, particularly looking for the types of evidence that support the constitutional entry into a home with only an arrest warrant."   (*Id.*) Mullins then met with his clients and prepared a letter which evaluated the case under *Pennington* but "made no reference to *Brinkley*."   (*Id.*)   Despite purportedly having read *Brinkley*, Mullins "does not believe that he highlighted or annotated a copy of *Brinkley*, like he had *Pennington*, and he did not save a copy of *Brinkley* in the file, like he had *Pennington*."   (*Id.*)

A little over two months later, defendants were served the complaint. (*Id.* at 4.) Mullins only then contacted Bailey to "draft a motion to dismiss only the *Monell* claim." (*Id.*) However, out of "an abundance of caution," the pair decided to include the Fourth Amendment argument as an additional basis for dismissal. (*Id.*) Mullins forwarded three items to Bailey for the motion to dismiss: the complaint; the client letter; and an annotated copy of *Pennington*. (*Id.*) Although *Brinkley* was absent from the materials forwarded to Bailey, *Pennington* itself discusses *Brinkley* in the majority opinion. Bailey later recognized his failure to thoroughly read *Pennington* and the resulting failure to cite *Brinkley*. (ECF No. 32 at 4–5.) Mullins signed the brief without verifying the research on April 15, 2024. (*Id.* at 5.) Both Respondents acknowledge that they should have "applied *Brinkley*" and "read *Pennington* far more carefully." (*Id.*) Their failures, they claim, were "sloppy and embarrassing." (*Id.*) However, Respondents assert they did not mean to intentionally mislead the Court, citing their experiences as judicial law clerks as supporting evidence. (*See id.* at 6–7.)

Following their written responses, the Court held a hearing to address the show cause order. Respondents again offered the excuse of doing "negligent research" as a reason for missing *Brinkley*. *See* Show Cause Order Hr'g Tr. at 9. By the Court's estimate, no less than eight times did counsel use a version of the word "sloppy" to describe their efforts in this case. *See generally id.* Bailey did not contend that he made the error some lawyers make in relying solely on the syllabus points in West Virginia Supreme Court of Appeals opinions. *Id.* at 7. However, Bailey admitted that his research was only "a little bit more than just pulling the syllabus point out [of *Pennington*], but far less than the research that [he] should have done." *Id.* Even though he acknowledged the multiple times *Brinkley* was cited in *Pennington*, Bailey claimed he still did not

find *Brinkley* because he "did a terrible job reading *Pennington*." *Id.* at 8.   When asked why his claim of courts universally holding *Pennington*'s position was not a lie, Bailey stated he was just "reading for the core" of the supporting syllabus point, whatever that means.   *Id.*

While Bailey acknowledged that the *Pennington* opinion explained that its own holding was "debated," that somehow "did not signal to [him] that the debate didn't all go one way."   *Id.* at 9–10.   As such, Bailey claims he "lulled himself" into believing that the caselaw was "universal."   *Id.*   To support his assertion that this was merely a mistake and not a lie, Bailey argued that he would have simply cited *Brinkley* had he found it because this higher standard of proof was "not that bad for us."   *Id.* at 11.   The Court also noted that Footnote 18 of *Pennington* explicitly wrestles with the Fourth Circuit's holding in *Brinkley*.   *Id.* at 13.   Bailey claimed that, because the footnote begins with "petitioner contends," he just "slopped over" the footnote entirely.   *Id.*   Despite a performance attempting to dance between raindrops worthy of Fred Astaire, counsel does not emerge dry.

## B.  Respondents Assertions are Unpersuasive

These excuses stretch the term "sloppiness" nearly beyond recognition.   Multiple points undermine Respondents' arguments.   First, no matter what Bailey states about *his* inability to find *Brinkley*, Mullins admitted that he both found it and read it.   Mullins's assertion that the passage of time somehow caused him to forget that he read on point, binding authority is unpersuasive. Two months is hardly enough time to forget such an important point.   Furthermore, Mullins choosing to mark-up and save *Pennington* but not *Brinkley* seems more like a deliberate choice than a mistake.   The fact that Bailey wrote the brief does little to save Respondents on this point. Mullins ultimately signed the brief in question, which carries with it his certification that "after an

inquiry reasonable under the circumstances," the "claims, defenses, and other legal contentions are warranted by existing law."   Fed. R. Civ. P. 11(b)(2).   An inquiry may have been done, but it was not reasonable, nor the contentions warranted.

Bailey's issues, on the other hand, start with his failures to conduct a reasonable inquiry. He claims that his research involved the complaint, a client letter, and the marked-up version of *Pennington*—all items provided to him by Mullins and not procured by Bailey himself.   What would convince an experienced attorney that this was enough to draft a motion to dismiss is difficult to fathom.   Bailey's research can only be considered an "inquiry" by the most generous understanding of the term.   Not only did he fail to perform independent research, he also indicated that he failed to read *Pennington* sufficiently.   Even if Bailey had read *Pennington* and simply "slopped" over the relevant split in authority, the term "universal" to describe the caselaw was still utterly unfounded.   The idea that any attorney can look at a single case and conclude that "Courts have universally rejected any suggestion" of an alternative position is preposterous.   (*See* ECF No. 11 at 5.)   If counsel wants to assert that a point of law is held universally after reading a single case, they had better point the Court to a string cite in that case to support it.   Otherwise, counsel would be required to create one only after much additional and thorough research.   In any event, neither happened here.   The only logical conclusion is that counsel either made up a proposition out of thin air or knowingly lied about it.   Neither bode well for counsel.

The concept that Respondents simply missed *Brinkley* or forgot about its existence is dubious at best.   Simply reading *Pennington* should have been enough to alert the Respondents that binding Fourth Circuit authority diverged from its holding and their position.   The majority of the Supreme Court of Appeals in *Pennington* noted the existence of the Fourth Circuit's

contradictory opinion in Footnote 18 of its opinion.    That footnote explicitly tees the issue up by stating: "Petitioner contends that, because West Virginia is within the jurisdiction of the Fourth Circuit, this Court should adopt the probable cause standard consistent with that court's holding in *United States v. Brinkley*, 980 F.3d 377 (4th Cir. 2020)."    *Pennington*, 247 W. Va. at 639 n.18. Some attorneys—improperly—glaze over footnotes.    However, the Respondents had another shot at catching the *Brinkley* issue in the dissent.    Surely before claiming a "universal" acceptance of a point of law, Respondents would have read the dissent's argument that "I believe that the quantum of proof standard adopted by the Fourth Circuit – reason to believe is tantamount to probable cause – should have controlled the resolution of this case."    *Id.* at 644.    Admittedly, some attorneys, apparently including Respondents, do not read dissents.    Fair enough.    Perhaps Respondents would have realized the split when the *Pennington* majority cited *Brinkley* in the body of the opinion and wrote "Petitioner contends that *Payton's* 'reasonable belief' standard requires that law enforcement have 'probable cause.' . . ."    *Id.* at 636.    Perhaps Respondents would have found that the caselaw was not so one sided when the majority stated that "[t]he issue of what quantum of proof is necessary to satisfy the reason to believe standard in the context of executing a lawful arrest warrant *has been frequently debated*."    *Id.* at 637 (emphasis added).    In short, Respondents had ample warning from *Pennington* alone that the caselaw was not universal.    The assertion that the *Pennington* Court phrased certain points in a way that caused an attorney to "slop over" the law is a flailing attempt to avoid responsibility.

Respondents state that they would have just cited *Brinkley* had they found it because it was "not that bad for us."    *See* Show Cause Order Hr'g Tr. at 11.    Really?    The argument Respondents put forward was that the warrant "told the officers that Wolfe's address" was where

8

they were searching and that they needed only "'a reason to believe' that the arrestee is to be found there." (ECF No. 11 at 6.)   Even assuming that merely listing an arrestee's address on an arrest warrant is sufficient to establish "reason to believe" she resides there, that is only the first question. Respondents seem to believe incorrectly that the only question is whether or not there is "reason to believe" a person resides at that address.   However, there are two distinct inquiries.   Putting *Payton* in the context of *Brinkley*, the second is this: when an officer wishes to "enter the dwelling in which the suspect lives," based solely on "an arrest warrant founded on probable cause," the searching officer must have "[probable cause that] the suspect is within."   *See Payton*, 445 U.S. at 602; *cf. Brinkley,* 980 F.3d at 386 (interpreting *Payton*'s "reason to believe" standard to require "probable cause").   Put simply, residency is just a threshold matter.   Actually believing the person to be inside contemporaneous with the search *is the relevant inquiry*.   At the Rule 12(b)(6) stage, Respondents' arguments probably would not prevail under *Pennington*, let alone *Brinkley*.

There is a great irony to all of this.   Respondents represented that they addressed the Fourth Amendment issue out of "an abundance of caution."   (ECF No. 32 at 4.)   Evidently, their approach was not cautious enough.   If counsel would have treated the matter with the care necessary to make their argument, this unfortunate episode would not have happened. Alternatively, Respondents could have been more cautious by not even addressing a matter unnecessary to their argument.   Yet, having made the choice to address it, Respondents were required to present a robust and thorough argument to the Court.   "Slop" is unacceptable. Respondents' clients deserve, and the Court demands, better.

*C. Sanctions*

In matters such as a frivolous filing, the Court draws authority to sanction from two sources. The first stems from this Court's inherent authority to discipline attorneys who commit misconduct before it. *See Byrd v. Hopson*, 108 F. App'x 749, 756–57 (4th Cir. 2004) (unpublished opinion). These sanctions can go up to and include "disbar[ing] or suspend[ing] lawyers from practice." *Id.* at 756 (citing *In re Evans,* 801 F.2d 703, 706 (4th Cir. 1986)). When exercising its inherent authority to impose sanctions, the Court must ensure that its power is "exercised with great caution." *Id.* (citing *Ex parte Burr*, 22 U.S. 529, 531 (1824) (Marshall, C.J.))

The second source of authority to sanction an attorney is the Federal Rules of Civil Procedure. *See generally* Fed. R. Civ. P. 11. Rule 11(b)(2) is most pertinent to this order. That rule states that "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*: the claims, defenses, and other legal contentions *are warranted by existing law*." Fed. R. Civ. P. 11(b)(2) (emphasis added). If, after giving notice and opportunity to be heard, the Court determines a violation of Rule 11(b) has occurred, it "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1).

As should be evident by this point, the arguments put forward by Respondents to support the motion to dismiss were not warranted by existing law. Further, as Respondents themselves have admitted, the arguments put forward were not formed after a reasonable inquiry.

10

Respondents have fallen squarely within the sanctionable conduct that Rule 11 contemplates. Their actions not only jeopardized their ability to practice law, it also jeopardized the firm with which they are associated, as well as their clients.

Ultimately, the Court will refrain from imposing sanctions on Respondents. As indicated above, monetary or practice-restriction sanctions are not issued lightly, and restraint is needed when this Court exercises its inherent authority. In the realm of Rule 11, the Fourth Circuit has cautioned that *sua sponte* sanctions, as in this case, should not be issued lightly. Doing so would defeat the "safe harbor" provision built into Rule 11, which gives attorneys the opportunity to withdraw an offending filing and correct errors. *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 151 (4th Cir. 2002) ("Importantly, a *sua sponte* show cause order deprives a lawyer against whom it is directed of the mandatory twenty-one day 'safe harbor' provision provided by the 1993 amendments to Rule 11. In such circumstances, a court is obliged to use extra care in imposing sanctions on offending lawyers."). Admittedly, the Court did not offer Respondents that opportunity prior to the show cause order. For those reasons, the Court finds that sanctions are not appropriate.

Further, sanctions are unnecessary given the outcome of this case. Counsel's misrepresentations were on an issue collateral to the Court's decision. The Court did not even need to address the Fourth Amendment issue in order to find that dismissal was proper. This circumstance mitigates the need to impose harsh penalties on Respondents.

The Court retains the authority to refer this matter to the authorities of the bar of which Respondents are members. *See* Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment) ("The court has available a variety of possible sanctions to impose for violations, such as . . .

referring the matter to disciplinary authorities . . . .")   The Court, however, will not make that referral.   Of course, this opinion is available for the public to read.   As such, those authorities are welcome to take any steps they find necessary to handle Respondents' transgressions in this matter.

While no sanctions will be imposed, Respondents' actions still have consequences.   They have been required to publicly explain their conduct to the Court.   Based on those explanations, it is evident to the Court—and by extension the public—that Respondents have given their clients a "sloppy" performance in this matter.   Their inattention to detail nearly put themselves and their clients in jeopardy.   The Court expects that this public proceeding will sufficiently deter Respondents and other practicing attorneys from presenting sub-standard pleadings in the future. If not, sanctions will always be available to penalize this kind of "sloppiness."   In this case, however, the process itself is sufficient.

### III.      CONCLUSION

For the reasons stated above, the Court **FINDS** that no sanctions shall be issued against the Respondents.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      May 16, 2025

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

12